Good morning, Your Honors. May it please the Court. My name is Michelle Barth and I represent the appellant, Mr. Dong. There are seven issues in this appeal. Given the limited time, I plan to focus on three issues, the Franks hearing, the 404B issue, and the acceptance of responsibility issue, beginning first with the Franks hearing. Dong's first issue on appeal is whether the district court erred when it failed to hold a Franks hearing. On appeal, Dong argued that a Franks hearing should have been held because there were critical omissions in the affidavits that were submitted to the various judges in this case. Specifically, there were two types of critical omissions. The first type of critical omission were the four private party drug transactions, which were disclosed by the government after Dong filed his initial moving papers. Sotomayor, could you tell me exactly how that was pertinent to the necessity I gather you think it's pertinent to the necessity showing that you needed to show with regard or that the government needed to show. How exactly? Well, it demonstrated that there were traditional methods available to one. Why? How? Because the law enforcement was successful in seeing the very crime. They were able to Well, that crime. This was a different crime. When you say it's a different crime, they were different transactions, but the idea was to discover the breadth of the conspiracy. Right. And what that omission demonstrated was that these traditional techniques of using CIs, of using the surveillance methods that it did, that they were able to use these methods in order to demonstrate they were able to use these methods, but were not able I'm sorry. They were using traditional techniques and You discovered discrete crimes, but they said they were trying to discover the overall breadth and structure of the conspiracy. But by not disclosing that they were able to identify different parties via these omissions that it left out of the affidavit, we don't know that those wiretaps were necessary to discover the breadth of the conspiracy. That's what the government said, that it didn't disturb To me, it would only have strengthened their hand. That's what I don't understand. It seems material in the wrong direction. Well, I'm not sure that I can change my mind about that, but we could talk about the second omission, which I think is pertinent to your inquiry, and that is the omission that wasn't disclosed by the government. The government didn't disclose that there was a prior buy between Dong and Agent Cho. That was never disclosed by the district court. Now, the government's main contention Never disclosed by the district court? Never disclosed to the district court. Okay. Yes. Now, the government's main contention is that Dong did not make a substantial enough showing to merit a Franks hearing, and that these omissions didn't matter to the necessity. But in making this argument, the government ignores its own role in handicapping Dong. The government knew all along about the Dong-Cho prior drug sale and didn't disclose it. Therefore, the court didn't consider it, and Dong didn't have the opportunity to argue it. As to the Franks issue or more generally? To the Franks issue. Okay. So tell me exactly how that's pertinent to the Franks issue. We have a direct drug sale between Dong, who was the target of the wiretap, between Dong and the government. It seems that would be pertinent to any district court judge trying to decide whether there was probable cause for these affidavits in support of the wiretap. Were there four different affidavits? Yes, there were four. Is it your position that all four of them were infirm? Yes. I know for sure the first one was. The affidavits, unfortunately, are not part of the record. Isn't there a representation by the government that some of the disclosures you're complaining about were made in some of the affidavits? Yes. And that was a factual dispute before the district court, that the district court never resolved, and that's part of the error here. It should have resolved that dispute via a Franks hearing, which could have been resolved quickly via a witness who was in the courtroom, a single witness. It's my understanding that all the affidavits were signed by Agent Cho, who was in the courtroom and could have testified to this, and we could have gotten to the bottom of it. Because this factual dispute remained unresolved, we don't know which affidavits were impacted by the four private party omissions. All of the affidavits presumably would be impacted by the Dong Cho contact, the drug sale contact, and that's been left unresolved. And you don't know whether the district court knew about that at the time, though? I don't believe that the district court knew about it. Now, the district court ---- I don't want to take up too much of your time. So you want to talk about 404B? I do want to talk about 404B. I did want to point out that the district court was present for the Latham hearing where the Dong Cho admission transpired. So it may be that the district court knew about it but wasn't remembering it at the time of the hearing. At that point, it is certain that Dong did not know about it. He wasn't present at the hearing. So moving to the 404B issue, the district court should not have admitted other acts evidence in the form of the phone calls that were played during the trial. Dong was depicted in a number of phone calls as being involved in smaller ecstasy pill sales, selling a personal use amount of cocaine that would be cooked into crack, being a part of a phone conversation with someone who advised Dong to have his house cleaned of any drug evidence by an associate named Blade. Why was it improper, given what the heads-up that the court had received about the defense that Dong hoped to run a trial? At that point, and that's one of the government's main contentions, is that it was admissible to demonstrate Dong's predisposition. But at the time the government played those phone calls, Dong had been barred from presenting an entrapment defense. The district court had even announced at that point it would not be giving an entrapment instruction, but instead intended to give what was the equivalent of an anti-entrapment instruction. That was conclusively decided at that point? Yes. I thought there were sort of two related points about the entrapment. One was that the judge was pretty clear from the outset, because our case law says it, that he couldn't have a derivative entrapment defense. But he wasn't going to rule until the end on the question of whether he could have made pat way out to be a government agent and therefore have an entrapment defense. Now, at the point that the 404B evidence came in, had that determination been made? Yes. The second determination, not the first one. If I understand the question correctly, yes. And that's at ER 47. Because at that point the judge had announced we will in fact be giving an anti-entrapment instruction. And we presume that the jurors followed those instructions. So at that point, that disposition evidence was irrelevant and certainly prejudicial. Because here the calls included other criminal drug transactions that bore little or no resemblance to the charged offenses. Moreover, Agent Cho testified that there were hundreds more phone calls, just like that one. And then, of course, it was a made objection. Was there any objection made? I mean, the second statement seems, you know, off the wall. But was there an objection made? No. There was no objection made. The evidence was admitted without any limiting instructions, so that really goes to prejudice here. And the error here was plain and affected his substantial rights. Because the government argued that very wiretap evidence in closing argument, and the jury asked about it. They asked for a readback of that very evidence at the time that they were deliberating and then came back with a guilty verdict. So I think it affected his substantial rights. But the problem is so difficult, isn't it, for you, because it would be a plain error standard. And then when you get to the next point, the 404B instruction, there's invited error, isn't there? Is there invited error? No, I don't think so. I think that the best case for me on that, and it's in the briefs, is Al-Faraheen. And in Al-Faraheen, the defense attorney was far more complicit in the error that the government can claim that Dong was in this case. And this Court, in order to apply invited error, is simply not enough for the defense attorney to be implicated in the error. In order to constitute a waiver under Ninth Circuit law, the defense counsel must make an intentional relinquishment or abandonment of a known right. Maybe I'm not understanding at what point in the trial this colloquy happened, because you don't have to instruct or discuss jury instructions at the very close of the evidence. But I understood it was at the close of the evidence where the judge talked about the 404B instruction and said, quote, we haven't had any. That was during the jury instruction conference. Right. But was it at the close of the evidence? No. I don't think so. I'd have to look at my ---- It's really important, because if the judge says we haven't had any given the kinds of evidence that you're describing and that the briefing describes, that's quite exceptional. Well, the phone calls came and were played right before the jury instruction conference. So those phone calls were played right before the jury instruction conference. I believe at that point the government still had three quick witnesses to call, if I'm recalling the excerpts of Redford. Okay. Well, I appreciate the clarification. But then how do we get a ---- how do you get around defense counsel agreeing with the judge's statement, we haven't had any? He didn't know. He didn't know it was 404B. He did not know. And neither did the judge, for that matter. That's how I read that. I'm sorry. I don't understand. Whatever this was, it was certainly 404B evidence. That's right. It's not permissible or nonpermissible, but it was 404B evidence. How does defense counsel not knowing change the fact or making this, if it's a blunder, change that it's invited error? It changes that it's an invited error because if you don't know, you're not giving up a known right. If you know and you intentionally give it up ---- You mean the mistake was so big that he ---- because he didn't even recognize the issue. Yes. And that's what Al-Faraheen says. You have to know about it in order to give it up. I see that I have ---- No time left. Thank you. Good morning. Rob Keenan for the government. Could you start with the 404B? Sure. The tapes were first identified, the five wiretap recordings and the translated transcript of those recordings were introduced through, I believe it was Special Agent Tran. He was early on in the trial because of his travel schedule. So I called him a little bit out of order. And it wasn't my intent actually to admit them at that time, but Judge Selma, I think, out of concern for that agent's travel schedule, asked me to admit it at that time. So they came officially into evidence well before the final ruling that no instruction on entrapment would be provided. However, they were played to the jury a little bit later through the testimony of Agent Cho. And I ---- And at that point had the judge made a decision about the derivative entrapment? My recollection, and I was just double checking it unsuccessfully, was that I played three or four of the calls, but not all five. I think the fifth one came in after the jury instruction hearing. I think there were three. I don't think I've ever seen 404B evidence quite like this, counsel. I mean, if that's helpful feedback to you, it's exceptional. Well, the evidence, in all candor, when preparing for the trial, I was informed by defense counsel clearly they intended to present an entrapment defense. So as I ---- Not a derivative entrapment offense, but an entrapment offense, saying that Petway was actually a government agent. Yeah. I think they said a derivative entrapment offense. Derivative. A derivative entrapment offense is simply precluded by Ninth Circuit law, and there was no reason to worry about it. Wasn't that the government's position? That was a nonstarter. Or was there any real debate? I didn't consider there to be any debate about it at all. Okay. So you're ---- But I ---- nonetheless, I take the defendant's counsel at his word when he says that's what I'm doing. And there was a hearing before the opening statements about how he wanted to present an entrapment defense. And, you know, Judge Selma had some guidelines that he put in on that subject. But so first ---- Guidelines meaning just to make sure that I don't ---- Don't use the word entrapment. In opening, you couldn't use the word entrapment. Correct. But other than that, none. No other restrictions. Okay. The ---- and then during the course of the trial, through cross-examination of, I think, two witnesses, the defense counsel tried to lay groundwork for some entrapment kind of theories. That, for example, that the undercover agent was pushing Scott Petway, the co-defendant, to, you know, get the deal done. And that put pressure on Petway to put pressure or, you know, stronger inducements for Mr. Dong. So ---- but in answer to your question about the 404B evidence, as I was preparing for trial, I asked that these five wiretap calls be translated for use in responding to an entrapment defense. I never argued that at the end of the day, that it was evidence of predisposition. But when I was preparing for trial and going forward with the trial, that was my primary focus, that it would be relevant under that. And I think that's what Judge Selma probably had in mind. But it ---- as an alternative basis, I did also consider Rule 404B. You can see that by virtue of the mere fact that in the joint proposed jury instructions, I included two joint instructions regarding, you know, the handling of Rule 404B evidence. Whatever it is, it's 404B, right? I think some of them. There's different reasons for doing it. I think some of them. I'm sorry. I'm not understanding what you're saying. Well, I think the response calls ---- They're prior actions, which you can either admit or not admit, and it depends on what your rationale is. But whatever it is, it's under 404B. I think as to most of them, yes. I'm not trying to be obscure at that point. There were five calls that are included in Exhibit 5 in the translations that ---- translated transcript that is Exhibit 6. The last one related to a call in December of 2009, about five months before or four months before the conspiracy regarding the specific 10,000 pill deal. But it was a telephone call between Mr. Dong and one of his other associates regarding the arrest of or feared arrest, a traffic stop on Scott Headway. And as a result of that stop, his house needed to be cleared out, presumably of drug evidence. So that, I think, is evidence of the conspiracy on an earlier date. So then you say it's relevant, it may be relevant to intent under 404B. But what was the intent issue? There wasn't an intent issue. I think it goes to ---- that last call goes to the direct evidence of the conspiracy before April of 2010. I mean, ordinarily when you say it's admissible for intent, it's when he's saying, oh, I didn't know this was a drug, or I didn't realize I was selling drugs. Then it could go to intent. But there's no argument like that. Lack of mistake, lack of accidents. Yes, but what ---- but he wasn't ---- there was no issue about mistake or accident. Well, I think there was some argument at trial where, number one, Dong's counsel tried to walk away from all of his admissions in his post-arrest interview. And at that point, putting that interview, those confessions or admissions aside, then it was a discussion about what does the other evidence show. And I think in that regard, it wound up getting close to a subject as to which 404B evidence would be applicable. For example, two of the telephone calls, the first two, were ones in which Mr. Dong used the same code language as Scott Petway. It suggests and goes to knowledge, and I think, again, that his involvement in May of 2010 on those two days during the 10,000 pill drug deal was knowing. It wasn't an accident that Scott Petway was going from the macaroni grill restaurant to Hung Dong's residence to meet with him on two occasions, two days in a row, right in the middle of a drug deal. So, in any event, I introduce it to respond to the entrapment defense and as an alternative basis under Rule 404B. But I think on 404B, the government's made no use, I made no use in the government's summation of the evidence. I made no reference to the wiretap calls at all. The only reference I made was in the rebuttal argument, literally, as it was phrased, as a sort of a throwaway that, you know, and it was only in reference to that last call between Scott Petway, in which Mr. Dong is concerned about the traffic stop on Scott Petway. And it was just that part. Was there a confession introduced in this case? Yes. I think it was at 4, I think. I'm not positive about that. But absolutely, we played, it was Exhibit 4. We played significant portions of the audio recording of the post-arrest interview where Mr. Dong admits that what the agents thought about their observations was entirely consistent with what, in fact, happened. So, and then the jury instruction issue on 404B, I wanted a 404B instruction in light of Judge Selma's decision to reject an entrapment defense. That's what I was concerned about. I made it clear to the district court. I made it clear to defense counsel. I was overruled.       In the cross-examination of the indicator, what do you mean by cross-examination? What do you mean about the defendant trying to walk away from his confession? Oh, in the cross-examination of the officer who interviewed Mr. Dong and also in Mr. Let me get quickly, if I might, to the Franks issue. The reply brief goes a little bit, as I read it, a little bit in greater scope beyond the Franks issue when it says that the government, quote, robbed, unquote, Mr. Dong of the opportunity to present a direct entrapment defense. And also today that it was never disclosed, the representation was made that Agent Cho's testimony was never disclosed to Mr. Dong. That's not accurate. And I want to at least make that clear. Prior to trial on March 14, 2012, the court reporter finalized the transcript regarding January 13, 2012, the day of Agent Cho's relevant testimony here. She emailed it to me and I forwarded the email directly to Mr. Dong's counsel. It was disclosed on March 14. You will note that the hearing was on March 12, so it was two days after the hearing. But the reason for that is the transcript wasn't available. I ordered all of the transcripts so that I could produce them to the defense. As to the prior to trial, I also disposed the testimony to the district court in camera. It's not available online on PACER, but the district court's standing trial order requires in-camera lodging of all prior testimony and statements of each government witness. We did that. So he had that available. And, of course, he listened to the testimony when it came in on Latham's motion to suppress. When we talk about Agent Cho's testimony, I think it's also important to note that there's way too much weight being placed on that one single-word answer to a single poorly phrased question. The question was, did you purchase from Mr. Dong? That the context is important in understanding what the word you meant and what Agent Cho understood the word you to mean. It was preceded by ten pages of questioning where Agent Cho wasn't asked simply about his own activities, but about the activities of the other members, task force officers of his investigative team. And so when he's asked, what did you do, it's fairly understood to mean, in other words, did you purchase from Mr. Dong, it's fairly understood by him to mean a reference not only to what he did personally, but also what his investigative team, other members that might be regarded in the same class as you, if you will. And the other point on that is his answer isn't at all clear in admission that he personally purchased the drugs from Mr. Dong in a direct drug transaction. And let me be clear, no such drug transaction ever occurred in which Agent Cho directly and personally purchased drugs from Mr. Dong. That transaction never happened. What he's referring to is one he testified about briefly on cross-examination at trial, where the informant that the FBI was using in this case purchased drugs from a woman by the name Tuan Bui, a female subject, and she got her drugs from a guy named Tuan Bui. Kim Bui was her name. Tuan Bui is her source of supply. And during one of, on August 5th, a drug transaction, which is disclosed in the wiretap affidavit, the first one, it was preceded by some wiretap telephone calls, right, and where the informant asked Kim Bui to get him some drugs. And then Kim Bui called Tuan Bui saying, I need some drugs in substance. And immediately before the drug deal was to go down, officers observed Tuan Bui meeting with an individual later identified, not at the time, he was an unidentified male, but later identified as Hung Dong. He met in a shopping center right before going to Kim Bui's home and presumably delivering the drugs. So there's been no omission of some direct personal drug deal between Agent Cho and Mr. Dong. What he was referring to is actually in the wiretap affidavits. I see I'm well behind my time. Did you have any questions of me? If not, thank you. I just wanted to make a couple of points. The government calls its closing argument regarding the wiretap affidavits a throwaway line. It wasn't a throwaway line. It was the very last remarks that the government made to the jury before they began their deliberations. Even assuming that this was somewhat over-the-top evidence, there was a confession that was introduced. There were people whom the agents testified. I mean, what was in dispute here that could have been affected by this evidence? The jury thought it was important. They asked to hear this evidence. I think that demonstrates it was important to reaching their verdict. If it didn't matter, if they were convinced beyond a reasonable doubt that he was guilty based on the evidence that you just described, then the note doesn't make any sense. We're just speculating. There may have been one person on the jury that said, well, you know, yeah, you know, I'm close on that. But I'd just like to hear that one conversation. I think that that. Nobody, you know, we just speculate on things like that. I think that that is speculation. What we do know is they asked about it. Well, they may ask about it just to please one of the jurors. It may have very well been the tipping point for them. Because they didn't have any limiting instruction, they could have used that awful 404B evidence any which way they wanted to. We don't know that it didn't have the impact that I'm describing. And it's likely that it did have the impact that I'm describing, because if the evidence was so overwhelming, they wouldn't have needed to hear it again. It didn't ‑‑ it wouldn't have impacted their guilty verdict at all. But they thought it was important. We don't know what goes on in the jury room. I mean, you can speculate any which way you want to. That is true. But we are in a position where we have to demonstrate that it impacted his substantial rights. And I think the jury note does show that it was important to their deliberations in some manner. We don't know how, but we know it was in some manner. And it may have very well been the tipping point for them. Two other things that the government said. One is the government said that they had disclosed the Latham transcript to Don's attorney. And I don't know if that's true or not. I did reach out to Don's attorney, and I asked him if he had received a copy of the transcript. He said he did, but that he had used it at the trial. Now, I've reviewed the trial transcripts. He didn't use it at the trial. And what the record makes painfully clear is that Cho's testimony regarding the drug sale was either not seen or lost on the attorney. So I don't know what the circumstances were, if it was turned over or if it was buried in a large pile of discovery. In the end, however, all Don was hearing from the government in open court and in its written submissions was that there was no governmental contact with Don. Now, the government's ---- Sotomayor, for whatever reason, I don't know the reason. You're not raising this as a Brady issue. You're not raising it as a Giglio issue. You're just raising it with regard to the Franks hearing. Is that right? That's correct. So everything you just said is irrelevant. I'm sorry? Everything you just said is irrelevant. When you say that, everything I just said is irrelevant. I.e., the fact that it wasn't used at trial or might have been used at trial. I mean, you've never made that argument. I don't know why you haven't made the argument, but you haven't. When I was looking at this issue, I was looking at issues that were preserved and could be tied to claims that were. So it's only relevant to the Franks issue, and I don't particularly see why it's any more relevant, all that relevant to the Franks issue. The government's position that this governmental contact didn't happen between Don and Joe, I did want to cover that really quickly, is self-serving. It hasn't been tested via cross-examination. Moreover, Don is not the only person who interpreted that portion of the transcript. When were the wiretaps concluded? When were. . . Wiretaps concluded. I believe in December of 2009. And when was this crime? In 2010, in May of 2010. So we don't even know whether what anything that Joe was talking about was at a relevant time period. It's true, but I don't think that the government should be able to benefit from not having disclosed it sooner. We could have explored all those facts and circumstances via the Franks hearing. So I don't see how the government should benefit from failing to disclose this. And that's what the government gets. It gets a benefit. With that, thank you. I will go to the next one, U.S. v. Latham.
judges: Pregerson, Berzon, Christen